**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

In re:

**PROVIZOR FEDERAL, INC.,**

      **Debtor.**

Chapter 11

Case No. 24-11528

<u>**NOTICE:**</u>

> MOVANT HAS ALSO FILED A MOTION TO SHORTEN THE TIME FOR RESPONSE AND/OR FOR AN EXPEDITED HEARING. IF THAT MOTION TO SHORTEN OR EXPEDITE IS GRANTED, THE TIME TO OBJECT AND/OR DATE FOR HEARING WILL BE CHANGED AS PROVIDED IN SUCH ORDER.

**DEBTOR'S <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO PAY PREPETITION WAGES AND COMPENSATION, (II) AUTHORIZING THE CONTINUATION OF EMPLOYEE BENEFIT PROGRAMS, (III) AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH EMPLOYEE OBLIGATIONS, <u>AND (IV) GRANTING RELATED RELIEF</u>**

Provizor Federal, Inc., the debtor and debtor in possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), by and through its proposed undersigned counsel, Ice Miller LLP, hereby submits this *Emergency Motion for entry of an Order (I) Authorizing the Debtor to Pay Prepetition Wages and Compensation, (II) Authorizing the Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief* (the "<u>Motion</u>"). In support of this Motion, the Debtor respectfully states as follows:

**I.**      <u>**JURISDICTION AND VENUE**</u>

1.      The United States Bankruptcy Court for the District of Maryland (the "<u>Court</u>") has jurisdiction over this Chapter 11 Case, the Debtor, property of the Debtor's estates, and this matter

under 28 U.S.C. §§ 157 and 1334 and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Pursuant to Rule 9013-6 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Bankruptcy Rules"), the Debtor consents to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue for this Chapter 11 Case in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are sections 105(a), 363(b), 507(a)(4), 507(a)(5), 507(a)(8), 541, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and rules 1005, 1015, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.      **RELIEF REQUESTED**

4.      To minimize the personal hardship the Debtor's employees (the "Employees") will suffer in connection with the filing of this Chapter 11 Case, the Debtor requests entry of an order (i) authorizing, but not directing, the Debtor to pay, in its discretion, prepetition wages and compensation (the "Prepetition Employee Obligations"), (ii) authorizing, but not directing, the Debtor to maintain and continue to honor the Employee Benefit Programs (as described in this Motion) as they were in effect as of the Petition Date, as may be modified, amended or supplemented from time to time in the ordinary course of business, and (iii) authorizing the applicable banks and other financial institutions (the "Banks") to receive, honor, process, and pay any and all checks presented for payment and all electronic payment requests made by the Debtor

2

related to the Employee Obligations, whether such checks were presented or electronic payment requests were submitted before or after the Petition Date.

### III.    BACKGROUND

5.      The Debtor, formerly OMV Medical, Inc., was established over 36 years ago to provide a comprehensive range of healthcare staffing solutions to the federal government and commercial markets, including at military base facilities across the continental United States and its territories. The Debtor is headquartered in Columbia, Maryland and is incorporated in Maryland.

6.      From its inception, the Debtor has provided high quality professionals and management services to various government agencies, most notably the Department of Defense. It has experience serving 125 military treatment facilities and 55 bases under 400 plus Department of Defense contract and service orders in 43 states and Germany. The Debtor provides services to facilities such as Camp Pendleton, MacDill Air Force Base, Camp Lejeune, Naval Medical Center Portsmouth, and Langley Air Force Base, among numerous others.

7.      The Debtor employs approximately 130 full and part time employees, and manages a roster of highly skilled healthcare professionals, ranging from physicians to mid-level providers who ensure the delivery of comprehensive care in a wide array of specialties, including specialty nursing, pharmacy, radiology, therapy, nutrition, laboratory services, emergency care, psychiatry, psychology, social services, critical care, and a burn unit.

8.      The Debtor filed for bankruptcy protection on February 26, 2024 (the "Petition Date") commencing this Chapter 11 Case and continues to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

9.      An Official Committee of Unsecured Creditors (a "Committee") has not been appointed in this Case, and no trustee has been appointed in this Case.

**IV.**    **THE DEBTOR'S WORKFORCE, COMPENSATION, AND BENEFITS**

10.    As set forth in the First Day Declaration, the Employees are the lifeblood of the Debtor's business. Government contractor employees play a crucial role in ensuring the healthcare and well-being of active-duty members in various branches of the military. These contractors are integral components of the support infrastructure that enables the military healthcare system to function effectively. Their contributions encompass a wide array of essential services, ranging from medical professionals such as doctors, nurses and specialists to administrative staff and support personnel.

11.    First and foremost, the Employees help alleviate the strain on military medical facilities by providing additional manpower and expertise. This manpower and experience is particularly significant in areas where the demand for healthcare services exceeds the capacity of military personnel alone. Contractor healthcare professionals often possess specialized skills and experience that complement those of military medical staff, enabling them to deliver high-quality care across a diverse range of medical specialties.

12.    Furthermore, the Employees contribute to the continuity and consistency of healthcare services for active-duty members. By filling gaps in staffing and expertise, the Employees help ensure that military personnel have access to timely and comprehensive medical care, regardless of their location or the nature of their healthcare needs. This continuity is essential for maintaining the health and readiness of the armed forces, as it enables service members to receive the care they require without disruption, even in challenging or remote environments.

13.    Additionally, the Employees play a vital role in supporting military healthcare operations through administrative and logistical functions. From managing medical records and scheduling appointments to coordinating patient transportation and facilitating communication between different healthcare providers, contractors help streamline and optimize the delivery of

healthcare services to active-duty members. Their behind-the-scenes efforts contribute to the overall efficiency and effectiveness of military healthcare systems, ensuring that resources are utilized judiciously and that service members receive the best possible care.

14.    In summary, the Employees are indispensable partners in the provision of healthcare services to active-duty members of the military. Their contributions extend beyond simply augmenting the workforce—they enhance the quality, accessibility, and efficiency of military healthcare, ultimately promoting the well-being and readiness of the men and women who serve in uniform. As such, recognizing and valuing the important role played by contractor employees is essential for maintaining a robust and resilient military healthcare system.

15.    The Employees currently consist of approximately 130 active W-2 employees and two employees classified as 1099 independent contractors. All of the Employees, who are distributed across approximately 20 states, are dedicated to serving the healthcare needs of our armed forces at military healthcare facilities. Within the workforce, the Debtor categorizes the Employees into distinct groups: (a) approximately 14 corporate employees, (b) approximately 7 part-time employees under the Service Contract Act ("SCA"), (c) approximately 90 full-time employees governed by the SCA, and (d) approximately 20 non-SCA employees.[1] Of the Employees, approximately 115 are compensated on an hourly basis, while the corporate employees are salaried. The Corporate employees fulfill administrative roles crucial to the functioning of Provizor, with operations primarily centered at Headquarters located in Columbia, Maryland, and Norfolk, Virginia.

---

[1]    The Debtor's Employee workforce is currently in flux because the Debtor is actively adding Employees to its payroll that previously provided services to the Debtor through a significant subcontractor.

16.     By this Motion, the Debtor seeks to alleviate the personal hardship faced by the Employees by the Debtor's potential inability to pay wages and benefits to the Employees. Foremost among the challenges faced by the Employees would be the immediate financial strain resulting from unpaid wages, potentially impeding their ability to meet basic needs, such as housing, utilities, and groceries, leading to potential eviction or foreclosure and a heightened sense of insecurity. Moreover, the lack of benefits, including healthcare coverage and retirement contributions, would exacerbate the financial burden and jeopardize the long-term well-being of the Employees and their families. The disruption in the income stream would further compound these difficulties, making it increasingly challenging to navigate daily expenses and financial obligations.

17.     Beyond the financial realm, the Employees would also grapple with significant emotional and psychological distress. The uncertainty surrounding their financial stability could lead to heightened levels of stress, anxiety, and mental health concerns. This, in turn, may strain relationships and impact overall work performance, creating a cycle of adversity that extends beyond the workplace. Practical consequences would also emerge, as Employees would encounter difficulties in securing alternative employment due to potential reputation damage and limited job opportunities. Furthermore, the long-term ramifications, including damage to credit scores and delayed recovery from financial setbacks, would perpetuate the hardships faced by the Employees.

18.     The Debtor relies heavily on the Employees, who are an essential and integral part of the Debtor's business operations. The Debtor's inability to pay the Employees would potentially impede the Debtor's ongoing operations as the Employees may choose to look for alternative employment opportunities.

V.   **EMPLOYEE OBLIGATIONS AND EMPLOYEE PROGRAMS**

    A.   **Unpaid Wages**

19.   Generally, in the ordinary course of business, the Debtor issues payroll to all Employees on a bi-weekly basis, with payroll being disbursed every other Friday. The Debtor pays monthly, on average, approximately $550,000 in gross wages and salary, and $1,000 in incentives.

20.   The vast majority of Debtor's payroll is distributed by direct deposit into the Employees' personal bank accounts.  In some instances, largely for new employees, the employee may be paid via check.

21.   The Debtor estimates that up to approximately $250,000.00 in prepetition wages, salaries and commissions are owed to Employees (or former Employees) (collectively, the "Unpaid Wages") for the prepetition period. Pursuant to this Motion, the Debtor seeks authorization, but not direction, to pay and honor in the ordinary course of business the Unpaid Wages and any uncashed paychecks and to continue to pay their Employees after the Petition Date in the ordinary course. If this Motion is granted, absent further order of the Court, the Debtor will not pay any individual Employee on account of prepetition Unpaid Wages amounts that, together with the other Employee Obligations, exceed $15,150.00.

22.   The Debtor also has an Employee Incentive Plan aimed at fostering employee engagement and recruitment efforts within the organization. The Employee Incentive Plan entails offering a referral bonus to employees who refer qualified applicants for open positions at with the Debtor. Upon successful clearance of credentials for both the Debtor and its client, the federal government, and subsequent commencement of employment and the completion of a 90-day probationary period by the referred candidate, the referring employee becomes eligible to receive a referral bonus of $1,000.00, subject to tax deductions.

23.     This incentive plan serves multiple purposes, including incentivizing employees to actively participate in the recruitment process, leveraging their networks to attract qualified talent, and ultimately contributing to the growth and success of the Debtor. By offering a monetary reward for successful referrals, the organization not only acknowledges the contributions of its employees but also cultivates a culture of collaboration and teamwork.

24.     Furthermore, the plan aligns with the Debtor's commitment to attracting and retaining top talent, and ensuring that the organization remains competitive in the marketplace. It incentivizes employees to actively engage in talent acquisition efforts, thereby enhancing the recruitment pipeline and facilitating the timely filling of critical positions within the organization.

25.     Through this Motion, the Debtor seeks permission to continue the Employee Incentive Program and to pay any amounts due or owing as of the result of pre- or post- petition efforts if its Employees.

**B.      Accrued Vacation**

26.     The Debtor maintains a vacation and sick time policy for SCA Employees and a paid-time off policy for non-SCA and corporate Employees. SCA Employees earn between 10 days and 20 days of vacation per year, depending on their years of service with the Debtor. Non-SCA and corporate Employees earn between 15 and 25 days of paid time off ("PTO") per year, again depending on their years of service with the Debtor. Accrued vacation and PTO is paid out upon separation of employment when required by state, local or other law.

27.     The Debtor requests that, to the extent applicable, it be authorized to continue to honor the accrued prepetition vacation and PTO obligations of its Employees (collectively, the "Accrued Vacation Obligations") and to continue its vacation and PTO programs postpetition in accordance with its prepetition policies.

C.     **Employee Benefits**

28.     The Debtor has established various plans and policies to provide eligible Employees with various medical, dental, prescription drug, vision, life insurance, severance, and other benefits (collectively, the "Employee Benefit Programs," and amounts owed under these plans, the "Employee Benefit Obligations"), which it intends to continue after the Petition Date in the ordinary course of business, subject to any adjustments or modifications that they determine are necessary, prudent, and in the best interests of their estates. The Debtor seeks the authority, but not the direction, to satisfy all outstanding amounts related to Employee Benefit Obligations that arose prior to the Petition Date including, without limitation, any payments for claims, premiums and fees owed for administrative costs, and other amounts required in connection with the Employee Benefit Obligations, as such amounts become due in the ordinary course of the Debtor's business. The Employee Benefit Programs include, but are not limited to, the following:

1.     **Medical, Dental, and Vision Benefits**

29.     The Debtor offers various health insurance plans (collectively, the "Health Plan") to employees working a minimum of thirty (30) hours per week on the 1st day of the month following their date of employment. There are approximately 19 Employees enrolled in the Health Plan, with total member coverage of 19. The Health Plan includes a variety of coverage options and is administered by CareFirst and UHC Global.

30.     The eligible Employees pay a portion of their health coverage through pre-tax payroll deductions, which amount also is dependent on the parties being covered. The Debtor subsidizes the remainder of the health program. The amount of Employee deductions for their share of health care costs are approximately $9,550.00 per month.

31.     The Debtor pays on average approximately $24,000.00 per month in premiums related to the Health Plan. As of the Petition Date, the Debtor owes approximately $16,000.00 on account of their prepetition obligations under the Health Plan, including administrative fees.

### 2.    Life Insurance, Disability Plans, and EAP

32.     The Debtor offers to its Employees: (i) employer-paid basic life and accidental death and dismemberment insurance ("Life Insurance"); and (ii) employer-paid short-term disability insurance (the "Disability Plan"). Eligible Employees may also elect to purchase, at their own cost, additional voluntary Life Insurance and long-term disability insurance for themselves and their families.

33.     The Disability Plan for eligible Employees replaces weekly earnings up to a weekly maximum of $2,400.00.

34.     The Life Insurance program provides Eligible Employees with $20,000.00 of coverage.

35.     The Debtor pays approximately $15,000.00 per month to The Hartford on account of the Life Insurance and Disability Plan (the vast majority being the employee contribution portion), and owe approximately $6,300.00 on account of prepetition obligations under these programs.

### 3.    Severance

36.     Historically, the Debtor has paid four pay periods, or two months, of severance (the "Severance Pay"). Due to a reduction in force that occurred prior to this Chapter 11 Case, the Debtor currently has Severance Pay obligations to one Employee. The Debtor hereby requests authorization, but not an order, to pay Severance Pay to that one employee as a matter of convenience in administering the estate. As of the Petition Date, the Debtor owes approximately $15,000.00 to one (1) employee in Severance Pay, which is at or below $15,150 per employee.

37.     Severance Pay is typically conditioned on a release of the Debtor and its affiliates, successors, assigns, and employees from any and all claims, liabilities, causes of action, and expenses, of any nature whatsoever pertaining or related to the Employee's employment with or separation from the Debtor.

38.     Given the critical need to continue their severance program, the Debtor is requesting interim approval to pay out Severance Pay to eligible Employees (with payment being made on the Debtor's regular payroll cycle) and to honor Severance Pay obligations. The Debtor will not pay any individual Severance Pay that, together with other Employee Obligations, exceeds $15,150.

### 4.     401(k) Plan and Retirement Savings

39.     The Debtor maintains a retirement savings plan (the "401(k) Plan"), administered by The Retirement Plan ("TRP"), that meets the requirements of section 401(k) of the Internal Revenue Code of 1986. For eligible Employees, the Debtor automatically enrolls new employee in the 401(k) Plan, with a deduction and contribution of 4% of each paycheck. Eligible Employees also can elect to make additional contributions to the 401(k) Plan through payroll deductions. The Debtor collects contributions from eligible, participating Employees each payroll cycle and transfer those contributions into the 401(k) Plan as directed by the Employees, typically on the same day payroll is paid. Some of these amounts collected from Employees may not have been transferred into the 401(k) Plan prior to the Petition Date. The Debtor pays quarterly amounts of $96,000.00 in the aggregate in administrative fees relating to the 401(k) Plan.

40.     By this Motion, the Debtor seeks authority, but not direction, to honor its obligations under the 401(k) Plan and to continue the 401(k) Plan in the ordinary course of its business.

### D.   Reimbursable Business Expenses

41.     As is customary with most large businesses, the Debtor reimburses its employees who incur and pay a variety of approved business-related expenses in the ordinary course of performing their duties, including payment for an Employee's use of his or her personal vehicle for company-related business, reimbursement to certain Employees for business cell phones, and reimbursement to certain Employees for health, wellness and business development expenses. Some Employees initially incur and pay such expenses by using personal credit cards or cash, but are subsequently reimbursed by the Debtor after submission and approval of expense or mileage reimbursement requests. The Debtor estimates that its average monthly payment to reimburse Employees for out-of-pocket business expenses is approximately $500.00. The Debtor estimates that, as of the Petition Date, approximately $500.00 is owed on account of reimbursable out-of-pocket expenses, including reimbursable mileage and cell phone payments.

42.     The Debtor also provides certain Employees with access to company-paid credit cards (the "Company Charge Cards") and other credit accounts through American Express and JP Morgan to pay for reimbursable business expenses (the "Company Expense Program"), including business travel, hotels, and the payment to various vendors for goods and services provided to the Debtor. As of the Petition Date, the Debtor estimates that approximately $50,000 is due and owing under the Company Charge Cards.

## VI.   BASIS FOR RELIEF

### A.   Payment of the Prepetition Employee Obligations Is a Sound Exercise of the Debtor's Fiduciary Duties.

43.     As a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is a fiduciary operating the business for the benefit of the creditors and other stakeholders. *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998); *In re CoServ,*

*L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Allied Sys. Holdings, Inc.*, 524 B.R. 598, 603 (Bankr. D. Del. 2015) (finding that directors of an insolvent corporation owed fiduciary duties both to the company and to its creditors).  Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *CoServ*, 273 B.R. at 497.  Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a pre-petition claim." *Id*.

44.     The *CoServ* court specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id*. There, the court applied a three-pronged test to determine whether a pre-plan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id*. at 498.

45.     Payment of the Prepetition Employee Obligations meets each element of the *CoServ* test. The Employees likely have priority claims against the Debtor for the Prepetition Employee Obligations. In addition, any failure by the Debtor to pay the Prepetition Employee Obligations could lead to retention issues. These retention issues would jeopardize the Debtor's business operations and its reorganization in this Chapter 11 Case. Failure to pay the Prepetition Employee Obligations as requested could also lead to litigation involving the Debtor that would waste the Debtor's necessary resources. In short, the potential harm and economic disadvantage

that would result from the failure to pay the Prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claims that the Debtor is seeking to pay as part of this Motion. Moreover, the Debtor has determined that there is no practical or legal alternative to payment of the Prepetition Employee Obligations. Therefore, payment of the Prepetition Employee Obligations is consistent with the Debtor's fiduciary duties as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code, and the Court should grant the requested relief.

**B.      Payment of the Prepetition Employee Obligations Is a Proper Application of the Doctrine of Necessity.**

46.      Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under 11 section 105 of the Bankruptcy Code, the bankruptcy court may permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor and to enable a successful reorganization. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985, 197 L. Ed. 2d 398 (2017); *see also In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *Ionosphere Clubs*, 98 B.R. at 175).

47.      Courts have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors based on the doctrine of necessity. *CoServ*, 273 B.R. at 497 (noting that the doctrine of necessity is necessary to carry out the provisions of the bankruptcy code because debtors in possession are fiduciaries of the estate); *see also In re All Trac Transp., Inc.*, 306 B.R. 859, 876 (Bankr. N.D. Tex. 2004). The "doctrine of necessity" also referred to as the "necessity of payment rule" functions in a chapter 11 reorganization as a mechanism by which the Bankruptcy Court can

exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code for the debtor to reach its goal of reorganization. *See In re Pioneer Health Services, Inc.*, 570 B.R. 228, 233 (Bankr. S.D. Miss. 2017). The doctrine is frequently invoked early in a chapter 11 case, particularly in connection with the payment of prepetition claims. *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 n.2 (Bankr. S.D. Tex. 2000) (applying the doctrine of necessity to allow debtors to provide their customers with billing credits for prepetition periods); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment).

48.    Courts have recognized the applicability of the doctrine of necessity especially with respect to the payment of prepetition employee compensation and benefits. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (approving the pre-plan payment of priority wage claims and employee benefits); *Equalnet*, 258 B.R. at 370 n.2 (stating that the payment of prepetition employee wages "in an ordinary course of business time frame is simple common sense."). Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested in this Motion.

49.    The requested relief represents a sound exercise of the Debtor's business judgment, is necessary to avoid immediate and irreparable harm to the Debtor's estate, and is therefore justified under applicable law. Paying prepetition wages, employee benefits, and similar items will benefit the Debtor's estate and creditors by allowing the Debtor to preserve its going concern value. Without the relief requested herein being granted immediately, current Employees may seek alternative opportunities, which could cripple the Debtor's business.

50.     Further, the payment of prepetition claims of employee wages, expenses, and benefits is customarily approved by Courts in this District in grating relief similar to that requested herein. *See, e.g., In re Novation Companies, Inc., et al.,* Case No. 16-19745 (DER) (Bankr. D. Md. July 25, 2016); *In re Thornburg Mortgage, Inc., et al.*, Case No. 09-17787 (NVA) (Bankr. D. Md. May 6, 2009).

### C.     Payment of the Prepetition Employee Obligations Is a Valid Exercise of the Debtor's Business Judgment Under Section 363(b).

51.     Under the Bankruptcy Code, a bankruptcy court may authorize a chapter 11 debtor to use property of the estate other than in the ordinary course of business where the debtor has articulated a valid business justification for the requested use of estate assets. *See In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."); *In re Filene's Basement, LLC*, No. 11-13511, 2014 WL 1713416, *12 (Bankr. D. Del. Apr. 29, 2014) ("Where the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct.") (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) gives the court "broad flexibility" for the debtor to pay prepetition wages as long as the debtor articulates a business justification); *U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 161 (D. Md. 2001), *aff'd sub nom. U.S. ex rel. Rahman v. Colkitt*, 61 F. App'x 860 (4th Cir. 2003).

52.     Once a debtor articulates such a valid business justification, a presumption exists in favor of the debtor's business decisions. *See In re Tower Air, Inc*., 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumption of the business judgment rule on the merits is a near-

Herculean task."); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (describing the business judgment rule as "a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company").

53.     The payment of the Prepetition Employee Obligations is consistent with the sound business purpose of maximizing the value of the Debtor's estates for the Debtor's creditors and stakeholders. The Debtor's success in this Chapter 11 case hinges in large part on the continued efforts and morale of the Employees through this critical transition period. Through the payment of the Prepetition Employee Obligations, the Debtor seeks to motivate and encourage the Employees to continue to support the Debtor's goals in this Chapter 11 Case. Accordingly, the Debtor respectfully submits that this Court should grant the requested relief under section 363 of the Bankruptcy Code.

   **D.     The Proposed Payments do Not Exceed the Statutory Cap Under Section 507 of the Bankruptcy Code.**

54.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave, and employee benefit contributions be accorded priority in payment in an amount not to exceed $15,150 for each employee (to the extent such amounts accrued within 180 days of the Petition Date). The Debtor does not believe that any of the Employees are owed amounts for accrued and unpaid prepetition wages or salaries, including outstanding and uncashed payroll checks, in excess of the statutory caps of Bankruptcy Code sections 507(a)(4) and 507(a)(5) and will not make any payments in excess of these statutory caps. Granting the relief requested is consistent with the Bankruptcy Code's purpose in ensuring employees are paid in full on account of the priority status of their

claims, up to the statutorily imposed limit. Accordingly, the Debtor submits that no prejudice to creditors or other parties in interest would result from granting the relief requested herein.

### E.    Payment of the Prepetition Employee Obligations Is Appropriate Under Section 541 of the Bankruptcy Code.

55.    The Debtor also seeks authority to pay certain deductions, withholdings, and payroll taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain deductions, including contributions to various benefits programs, child support, and alimony payments, are not property of the Debtor's estate because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b); *Begier v. IRS*, 496 U.S. 53, 59 (1990) (holding that taxes such as excise taxes, FICA taxes, and withholding taxes are property held by the debtor in trust for another and, as such, do not constitute property of the estate); *see also Old Republic Nat'l Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 721 (4th Cir. 1998) (holding that deposits subject to an express trust are excluded from the bankruptcy estate); *City of Farrell v. Sharon Steel Corp.* (*In re Sharon Steel Corp.*), 41 F.3d 92, 98–103 (3d Cir. 1994) (finding that funds withheld from employees' paychecks may be subject to a trust, and thus are not property of a debtor's estate, even where such funds were commingled with the debtor's other property). Accordingly, such funds are not available for general distribution to a Debtor's creditors.

56.    Further, federal and state laws require the Debtor and its officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell*, 41 F.3d at 95–97 (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes).

57.     Because the deductions and payroll taxes are not property of the Debtor's estate, the Debtor requests that this Court authorize them to transmit the deductions and payroll taxes to the proper parties. In addition, the United States and many states in which the Debtor operates have laws providing that the Debtor's officers, directors, or other responsible employees could, under certain circumstances, be held personally liable for the nonpayment of such taxes. *See DuCharmes & Co., Inc. v. State of Mich. (In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). To the extent that any taxes remain unpaid as of the Petition Date and thereafter in these jurisdictions, the Debtor's officers and directors could be subject to lawsuits or other collection efforts during the pendency of this Chapter 11 Case. This would be extremely distracting for the Debtor and would unnecessarily divert the attention of its directors and officers at this critical time. In addition, non-payment of such taxes may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code, such that the remittance of such amounts would only impact the timing of the payments. Accordingly, the Debtor submits that the relief requested herein is in the best interests of the Debtor's estates.

58.     Accordingly, for all of the foregoing reasons, the Debtor submits that there is ample cause for granting the requested relief.

## VII.    EMERGENCY CONSIDERATION

59.     The Debtor Requests emergency consideration of the Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in granting the relief requested could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first

21 days of these chapter 11 cases could disrupt the Debtor's operations at this critical juncture and imperil the Debtor's restructuring. The Debtor satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

## VIII.   WAIVER OF MEMORANDUM OF POINTS AND AUTHORITIES

60.     Pursuant to Rule 9013-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, and because there are no novel issues of law presented in the motion and all applicable authority is set forth in this Motion, the Debtor states that, in lieu of submitting a memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth herein.

## IX.   RESERVATION OF RIGHTS

61.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the

validity of any particular claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## X.    NOTICE

62.    The Debtor provided advance notice of this Motion and the First Day Motions to the Office of the United States Trustee.

63.    No trustee, examiner, or creditors' committee has been appointed in this Case. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee, (ii) all other parties identified on the Consolidated List of 20 Largest Unsecured Creditors filed herein by the Debtor, (iii) the Debtor's secured lender, (iv) the Debtor's cash management banks, including JP Morgan Chase Bank and American Express and (vi) any other parties in interest who received notice of the First Day Motions (collectively, the "Notice Parties").

64.    The Debtor submits that, its estate, its creditors, nor any parties in interest will be prejudiced by shortening the time to respond to the First Day Motions.

65.    The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that this Court enter the order substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion, and grants such other and further relief as this Court may deem just and proper.

Dated: February 26, 2024

Respectfully submitted,

*/s/ Kevin G. Hroblak*
Kevin G. Hroblak (Bar No. 26180)
Aaron L. Casagrande (Bar No. 28518)
Michael P. Collins, Jr. (Bar No. 20805)
**ICE MILLER LLP**
100 Light Street, Suite 1350
Baltimore, Maryland 21202
Phone: 410-951-5874
Kevin.Hroblak@IceMiller.com
Aaron.Casagrande@IceMiller.com
Michael.Collins@IceMiller.com

-and-

Jeffrey A. Hokanson (*pro hac vice* forthcoming)
**ICE MILLER LLP**
One American Square, Suite 2900
Indianapolis, IN 46282
Ph: 317-236-2236
Jeff.Hokanson@IceMiller.com

*Proposed Counsel for Debtor*