UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

*In re:*

PROVIZOR FEDERAL, INC.,

      Debtor.

CHAPTER 11

CASE NO. 24-11528 DER

_____

## SECURED CREDITOR LOYAL SOURCE GOVERNMENT SERVICES, LLC'S (A) OBJECTION TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; (V) AUTHORIZING USE OF CASH COLLATERAL; (VI) SCHEDULING A FINAL HEARING AND (VII) GRANTING RELATED RELIEF [DOC NO. 10]

Secured creditor Loyal Source Government Services, LLC ("Loyal Source"), by and through undersigned counsel, and pursuant to sections 362, 363, and 105 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001(a)(1) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) objects to the *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing; (ii) Granting Security Interests and Superpriority Administrative Expense Status; (iii) Granting Adequate Protection; (iv) Modifying Automatic Stay; (v) Authorizing Use of Cash Collateral; (vi) Scheduling a Final Hearing and (vii) Granting Related Relief* [Doc. No. 10] (the "Motion")[1], filed by Provizor Federal, Inc. (the "Debtor"), and in support thereof, states as follows:

### PRELIMINARY STATEMENT

By the Motion, the Debtor impermissibly seeks to use and encumber funds in its possession that are subject to a valid, pre-petition constructive trust established in Loyal Source's favor.  Such

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Financing and Cash Collateral Motion.

funds consist of payments received by the Debtor from the United Stated Federal Government pursuant to a certain Prime Contract entered into between the Debtor and the government. Loyal Source and the Debtor are parties to a certain Subcontract Agreement under which Loyal Source provided support services to the Debtor to enable the Debtor to fulfill its obligations to the government under the Prime Contract.

As a result of the Debtor's defaults on its payment obligations to Loyal Source under the Subcontract Agreement, Loyal Source obtained arbitration awards against the Debtor, which have been confirmed by a judgment entered by the United States District Court for the District of Maryland on January 29, 2024 (the "Judgment"). The Judgment (as subsequently corrected) required the Debtor to immediately pay Loyal Source over $10 million plus interest. The Judgment further imposed a constructive trust on any payments the Debtor received from the Government on or after January 5, 2024[2] under the Prime Contract for services provide by Loyal Source to the Debtor pursuant to the Subcontract Agreement.

The Debtor acknowledges that, pursuant to a certain Subcontract Agreement and Judgment, Loyal Source is a secured creditor to the extent of any collateral available to it based on the Judgment. The Debtor further acknowledges that Loyal Source has an interest in the "Cash Collateral" it seeks permission to use. However, the Debtor is prohibited from using or encumbering any funds subject to Loyal Source's constructive trust pursuant to the Judgment as such funds held in trust do not constitute property of the Debtor's bankruptcy estate. Similarly, the Debtor should be prohibited from granting the DIP Lender any security interest or liens on funds to which the Debtor has no right.

---

[2] Loyal Source moved to amend the Judgment on February 23, 2024 to conform with the Second Award (as defined below) which imposed a constructive trust on all future payments received from November 21, 2023 forward.

Accordingly, Loyal Source objects to the Motion insofar as it seeks to (i) use any funds received from the government subject to Loyal Source's constructive trust as cash collateral and (ii) grant the DIP Lender liens on such funds. Further, Loyal Source requests that the Debtor be prohibited from using and encumbering of any funds subject to the constructive trust pending adjudication of Loyal Source's and the DIP Lender's respective rights therein.[3] Absent such relief, Loyal Source will be irreparably harmed by the Debtor's use and encumbrance of funds to which the Debtor and the DIP Lender have no equitable interests or rights.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this case under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELEVANT FACTUAL BACKGROUND

### A. The Bankruptcy Case

2. On February 26, 2024 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code with this Court initiating the above-captioned bankruptcy case (the "Bankruptcy Case").

3. The Debtor is operating its businesses and managing its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B. The Debtor's Indebtedness to Secured Creditor Loyal Source

4. Prior to the Petition Date, on October 23, 2017, OMV Medical, Inc.[4] n/k/a Provizor Federal, Inc. (the "Debtor") and the Defense Health Agency of the United States Federal

---

[3] Loyal Source intends to file a motion for relief from stay to permit the District Court to adjudicate these respective rights.

[4] For the sake of clarity and simplicity, references herein to the "Debtor" include references to OMV Medical, Inc.

Government (the "Government") entered into a certain Prime Contract wherein the Debtor agreed to provide medical staffing and ancillary services to the Government (the "Prime Contract"). *See* November 21, 2023 *Opinion and Interim Order Lifting the September 6, 2023 Stay, Granting Claimant's Emergency Motions, Entering Monetary Awards, and Establishing a Constructive Trust* that memorializes these findings of fact, which is attached hereto as **Exhibit "A"** at p. 2.

5.       On March 16, 2018, Loyal Source and the Debtor executed that certain *Subcontract Agreement* in which Loyal Source agreed to "provide support services to [the Debtor], to enable [the Debtor] to fulfill its obligations under the Prime Contract" (the "Subcontract Agreement"). *See id*. at p. 3.

6.       That relationship functions as follows: Loyal Source would submit invoices for its services to the Debtor, who would have thirty (30) days to pay Loyal Source; however, if the Government delayed its payments to the Debtor, the Debtor would have sixty (60) days to pay Loyal Source. *See id*.

7.       The Subcontract Agreement between the Debtor and Loyal Source stipulated that any disputes arising therefrom are subject to arbitration before the American Arbitration Association (the "AAA").  *See id*.

8.       On or about October 19, 2021, Impel Capital, LLC ("Impel") acquired a majority ownership interest in Debtor. *See id*. Impel is a "holding company that wholly owns [Debtor]." *Id*.

9.       Thereafter, the Debtor defaulted on the Subcontract Agreement and missed several payments owed to Loyal Source. *See id*.

10.      On April 5, 2023, Loyal Source filed a petition for arbitration before the AAA for damages and injunctive relief against the Debtor. Ultimately, Loyal Source prevailed against the Debtor.  *See id*. at pp. 3, 5.

4

11.     On August 31, 2023, an Independent Auditor in the AAA dispute entered a Final Report confirming that the Debtor owed Loyal Source $8,007,705.00 for 829 invoices submitted under the Subcontract Agreement through August 15, 2023.  *See id*. at p. 5.

12.     On September 6, 2023, the AAA arbitrator entered an Order (the "September 6th Order") requiring the Debtor to pay Loyal Source $175,000.00 on a weekly basis, "including interest at a SOFR plus 1.75% per annum on outstanding amounts."  *Id*. at p. 5.

13.     The Debtor did not comply with the September 6th Order and failed to make several weekly payments owed to Loyal Source.  To compel the Debtor's compliance, Loyal Source moved for emergency relief against the Debtor and prevailed.  *See id*. at pp. 5-7.

14.     On October 19, 2023, the AAA arbitrator entered an *Order and Interim Award* requiring Debtor to pay Loyal Source $1,945,436.15 (the "Interim Award"), which represented the prior past-due payments that were owed by Debtor to Loyal Source under the September 6th Order. The Interim Award was without prejudice to Loyal Source seeking additional awards in the event of future defaults by the Debtor.  *See id*. at p. 8.

15.     The Debtor subsequently defaulted on the September 6th Order and the Interim Award by failing to make several payments due and owing thereunder.  *See id*. at pp. 8-9.

16.     Accordingly, Loyal Source filed, and later prevailed on, its *Motion Requesting an Emergency Hearing* due to Debtor's defaults on the Interim Award and the September 6th Order. *See id*. at p. 8.

17.     On November 21, 2023, the AAA arbitrator issued an *Opinion and Interim Order Lifting the September 6, 2023 Stay, Granting Claimant's Emergency Motions, Entering Monetary Awards, and Establishing a Constructive Trust* (the "Second Award") that awarded Loyal Source a second arbitration award that required Debtor to pay $8,621,243.46 to Loyal Source as follows:

5

a. Debtor shall immediately pay Loyal Source $7,307,704.96, which reflects the accelerated outstanding past-due balance of PAID IN WAWF[5] funds, *see id*. at p. 19;

b. Debtor shall immediately pay Loyal Source $1,313,538.50, reflecting prior notices of default sent on October 20, 2023, and November 9, 2023, under FUTURE PAID IN WAWF, *see id*.;

c. The amounts awarded therein "will accrue interest at the rate of the Secured Overnight Financing Rate (SOFR), as of the date of this Order, plus 1.75% per annum, until payment in full is made", *see id.*

18. The Second Award further imposed a constructive trust in favor of Loyal Source on all future payments received by the Debtor from the Government under the Prime Contract for services provided by Loyal Source to the Debtor under the Subcontract Agreement: "***A constructive trust is imposed on all future Government payments to [Debtor], under the October 23, 2017 Prime Contract, for services by Loyal Source to [Debtor], pursuant to the March 16, 2018 Subcontract Agreement***".  *See id.* ¶ 6 (emphasis added).

19. The Second Award enjoined Impel Capital from transferring, withdrawing, or using as collateral all prior Government payments for services provided by Loyal Source but not paid to the Debtor or transferring any beneficial interest in the Prime Contract or Subcontract Agreement to any third party:

a. "Impel Capital 'which is a member of the holding company that wholly owns Provisor Federal , Inc., previously OMV Medical. Inc.' [Exhibit V at ¶ 2], and

---

[5] Debtor and Loyal Source used Wide Area Workflow (WAWF) for all payments made and received under the Subcontract Agreement. WAWF is a secure Web-based system for electronic invoicing, receipt, and acceptance that allows federal government vendors to submit and track invoices and receipt/acceptance documents of the Web and facilitates government personnel's ability to process invoices in a real-time paperless environment.

their respective Directors, Officers, or other Principals, are enjoined from transferring, withdrawing, or using as collateral any and all prior payments made by the Government to [Debtor] for services provided by Loyal Source under the March 16, 2018 Subcontract Agreement, but not paid to [Debtor], irrespective of whether such payments may now reside in bank accounts, bank or other lock boxes, or subject to other financial instruments." *Id*. at p. 20 ¶ 8;

b.  "Impel Capital . . . is enjoined from transferring any beneficial interest in the October 23, 2017 Prime Contract or the March 16, 2018 Subcontract Agreement to any third party." *Id*. at p. 20 ¶ 9.

20.     The next day, the Second Award was amended to show that the total amount due and owing to Loyal Source was, in fact, $10,031,135.02. A true and correct copy of the Erratum to the Second Award is attached hereto as **Exhibit "B"**.

21.     Thereafter, Loyal Source moved to confirm the Second Award in the United States District Court for the District of Maryland (the "District Court").

22.     On January 5, 2024, the District Court confirmed the Interim Award and the Second Award against the Debtor (the "District Court Order").  A true and correct copy of the District Court Order is attached hereto as **Exhibit "C"**.

23.     On January 9, 2024, Loyal Source sent correspondence to the President and CEO of Kore Capital Corporation ("Kore")[6], Kweisi Rogers, that included a copy of the District Court Order, the Interim Award, and the Second Award, which imposed the Constructive Trust in Loyal Source's favor.  *See* January 9, 2024 correspondence to Kore attached hereto as **Exhibit "D"**.

---

[6] Kore and Debtor had a pre-petition relationship based on an October 7, 2021 Revolving Credit and Security Agreement. Notably, that Agreement between Debtor and Kore appoints Kore as Debtor's attorney-in-fact.

24. In this letter, Loyal Source indicated that it had become aware during the arbitration that Kore had a business arrangement with the Debtor that might result in Kore coming into possession of or having some claim to funds paid to the Debtor by the Government. To avoid any doubt, Loyal Source's correspondence to Kore explained that Loyal Source had a constructive trust on all Government Payments to the Debtor for Loyal Source's services, and advised Kore that it must respect and may not violate the award and court order that imposes the constructive trust and may not appropriate, use, or encumber any Government payments on invoices that bill for Loyal Source services.

25. Kore did not acknowledge or respond to Loyal Source's correspondence.

26. Meanwhile, the Debtor did not comply with the District Court Order. Consequently, on January 16, 2024, Loyal Source moved to enforce same.

27. On January 19, 2024, the District Court entered a paperless Order clarifying that "because this Court has affirmed the awards, for any payments [Debtor] received from the government on or after January 5, 2024, it must provide to Loyal Source within 48 hours of this order (or for future payments, within 48 hours of receipt) the following information: the amounts received, dates of receipt, corresponding OMV and Loyal Source invoice numbers, and the account information for all accounts holding any of the Government payments".

28. Then, on January 29, 2024, the District Court entered the *Order and Judgment* (the "Judgment") confirming the Interim Award and the Second Award and awarding Loyal Source a money judgment of nearly $11,976,571.17 plus interest at the rate of the Secured Overnight Financing Rate (SOFR), as of January 5, 2024 plus 1.75% per annum, until payment in full is made." A true and correct copy of the Judgment is attached as **Exhibit "E"**, *see* ¶¶ 3-4.

8

29.    The Judgment further provides that "*[a] constructive trust is imposed* on any payments [Debtor] received from the Government on or after January 5, 2024, under the October 23, 2017 Prime Contract between the Government and [Debtor], for services provide by Loyal Source to [Debtor], pursuant to the March 16, 2018 Subcontract Agreement." *Id*. at ¶ 5(emphasis added).

30.    Similar to the Second Award, the Judgment provides that:

a.    "Any party acting in active concert or in privity with [the Debtor], including but not limited to Impel Capital, and their respective Directors, Officers, or other Principals are enjoined from transferring, withdrawing, or using as collateral an and all prior payments made by the Government to [the Debtor] for services provided by Loyal Source under the March 16, 208 Subcontract Agreement, but not paid to [the Debtor], irrespective of whether such payments may now reside in bank accounts, bank or other lockboxes, or subject to other financial instruments, either in the United States or abroad;"

b.    "Any party active in active concert or in privity with [the Debtor], including but not limited to Impel Capital, is enjoined from transferring any beneficial interest in the October 23, 2017 Prime Contract or the March 16, 2018 Subcontract Agreement to any third-party;"

*Id.* at ¶¶ 7, 8.

31.    On February 23, 2024, Loyal Source filed in the District Court its *Motion to Amend Judgment* so that the Judgment would conform with the Second Award and a constructive trust would be imposed on all payments that the Debtor received from the Government from November 21, 2023 until present. A true and correct copy of the *Motion to Amend* is attached as **Exhibit "F"**.

32.     Loyal Source filed its *Motion to Amend* because, upon information and belief and the prior dealings between the Government and the Debtor, the Debtor likely received millions of dollars for services that Loyal Source provided under the Subcontract Agreement. *See id.*

33.     Since the District Court Order was entered on January 5, 2024, Loyal Source believes that Kore has taken at least $2,000,000.00 in Government Payments on Loyal Source's invoices and, upon information and belief, presumably millions more of Government Payments of Debtor's invoices for Loyal Source's services.

34.     Accordingly, Loyal Source moved expeditiously to protect its interests on the funds subject to its constructive trust pursuant to the Interim Award, the Second Award, and the Judgment. *See id.*

35.     On February 12, 2024, Kore filed a motion to alter or amend the Judgment, asserting that is has a first priority perfected security interest in all present and future assets of the Debtor to secure payments of amounts due under its Revolving Credit and Security Agreement with the Debtor dated October 7, 2021.  *See* ¶ 2 of Kore's motion, attached hereto as **Exhibit "G"**. In that motion, Kore acknowledges that "Kore has received, since January 5, 2024, proceeds of [the Debtor's] accounts receivable, a portion of which may arguably fall within the language of the Order and Judgment," but asserts that such funds "that are subject to Kore's first priority security interest in such collateral."  *Id.* at ¶ 6.

36.     Loyal Source disputes that Kore has a priority lien in funds subject to its constructive trust.

### C.  The Debtor's Financing and Cash Collateral Motion

37.     On the Petition Date, Debtor filed its Motion [Doc. No 10], seeking, *inter alia*:

10

a. authority to obtain postpetition financing on a secured superpriority basis, consisting of a revolving loan facility in the aggregate principal amount of up to $5 million funded by Kore, as the proposed DIP Lender;

b. authority to use the proceeds of the Interim Loan portion of the DIP Loans and Cash Collateral to funds payments related to (a) postpetition working capital and other general corporate needs of the Debtor during the pendency of the Bankruptcy Case, including the payment of (i) fees, costs, and expenses of the DIP Facility, and (ii) professional fees and expenses; and (b) bankruptcy-related costs and expenses;

c. authorizing the Debtor to provide adequate protection to Kore's interest in certain Prepetition Collateral, including the Cash Collateral; and

d. authorizing the Debtor to grant the DIP Lender security interests, liens and superpriority claims, including allowed superpriority administrative expense claims, in the DIP Collateral and all proceeds thereof, including, without limitation, all property constituting "Cash Collateral", to secure the DIP Obligations, subject to a Carve Out.

38. More specifically, the Debtor's proposes to use Cash Collateral to (a) pay fees, costs, and expenses incurred in connection with the Bankruptcy Case, (b) fund any obligations benefitting from the Carve Out, (c) permit the orderly continuation of the operation of its business, (d) maintain business relationships with customers, vendors, and suppliers, (e) make payroll, and (f) satisfy other working capital and operational needs. *See* Motion at ¶ 13.

39. Loyal Source objects to the Debtor's proposed use of any funds subject to Loyal Source's constructive trust as cash collateral in this Bankruptcy Case and to the granting of any liens in such funds to the DIP Lender.

## LEGAL ANALYSIS

**A. The Court Should Deny the Motion Insofar as It Seeks to (i) Use Funds Subject to Loyal Source's Constructive Trust as Cash Collateral or (ii) Grant the DIP Lender a Security Interest Therein.**

40.     The Debtor states that Loyal Source is a secured creditor with an interest the Debtor's cash collateral pursuant to the Judgment. *See* Motion p. 12; *Declaration of Justin Reaves in Support of Petition and First-Day Motions* [Doc No. 2] ¶ 2 (the "Declaration") ("Loyal Source is a secured creditor of the Debtor pursuant to a certain Subcontract Agreement and Judgment"). Certainly, Loyal Source has an interest in all funds received from the Government for services provided to the Debtor under the Subcontract Agreement. The Debtors propose to use such funds as "Cash Collateral" to fund future operations.

41.     Moreover, while acknowledging the existence of Loyal Source's constructive trust, the Debtors nevertheless propose to grant the DIP Lender a security interest in and liens on the Debtor's existing and after-acquired assets, "including all accounts receivable, ***which shall not be subject to a constructive trust in favor of Loyal Source Government Services, LLC***". *See* Motion at ¶ 16 (emphasis added).

42.     More specifically, the Debtor propose that, immediately upon entry of the Interim Order, the DIP Lender will be granted first priority DIP Liens in the DIP Collateral, including property subject to a constructive trust in favor of Loyal Source:

> the DIP Lender is granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected first priority DIP Liens in the DIP Collateral as follows, in each case subject to the Carve Out:
> . . .
>
> (iii) **Liens Junior to Certain Other Liens.** Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in

clauses (i) and (ii)) junior only to the "Permitted Prior Liens" which shall include valid, enforceable, and non-avoidable liens that are (a) either perfected as of the Petition Date or perfected on or after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, (b) not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (c) senior in priority to the DIP Lender's Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements. ***For the avoidance of doubt, Permitted Prior Liens shall not include any interest of Loyal Source Government Services, Inc. in property of the Debtor***.

*See id.* Ex. A, Debtor's proposed Interim Order ¶ 7(iii).

43.     The Debtor further states that "advances against any invoices containing revenue derived from Loyal Source labor are subject to court approval and granting of priority to DIP Lender." *Id.* at p. 13 (emphasis added).

44.     The Debtors do not, however, explain how payments subject to a constructive trust are property of the bankruptcy estate, why Loyal Source's interest in payments received from the Government for services provided to the Debtor by Loyal Source should not be included as a "Permitted Prior Lien", or why such funds should not otherwise be protected from the DIP Liens' attachment.  The Debtor provides no legal authority permitting it to ignore Loyal Source's property rights in the funds subject to the constructive trust.  Instead, the Motion includes a "Waiver of Memorandum of Points and Authorities".  *See id. ¶* 22.

### B. Government Payments for Services Provided by Loyal Source Are Not Property of the Estate or Cash Collateral and Cannot Be Included in DIP Collateral

45.     Pursuant to section 541 of the Bankruptcy Code, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C.A. § 541.  However, section 541(d) of the Code limits the scope of the estate such that "property in which the debtor holds . . . only legal title and not an equitable interest . . . becomes

13

property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." *Id.* at 541(d).

46.    For property to be deemed property of the estate under section 541(d), the debtor must hold **both** legal and equitable title thereto. *See In re Lan Tamers, Inc.*, 281 B.R. 782, 791–92 (Bankr. D. Mass. 2002), *subsequently aff'd sub nom. In re LAN Tamers, Inc.*, 329 F.3d 204 (1st Cir. 2003) ("For the funds to be deemed property of the estate under § 541(d), the Debtor must hold both legal and equitable title in the Reimbursements.").

47.    A debtor does not own an equitable interest in property it holds in trust for another, and therefore, such property is excluded from property of the estate. *See Begier v. IRS,* 496 U.S. 53, 58 (1990) ("Because [a] debtor does not own an equitable interest in property [it] holds in trust for another, that interest is not 'property of the estate.'"); *see also In re FirstPay, Inc.*, 773 F.3d 583, 591 (4th Cir. 2014) (finding that debtor had no equitable interest in trust property held by debtor only for payment of clients' taxes); *In re Lan Tamers, Inc.*, 281 B.R. at 793 (holding "that the Debtor lacks equitable title in the Reimbursements because it holds the funds under constructive trust for the benefit of the City."); *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir.1989) (stating, in context of contract clause establishing a constructive trust, that "the legislative history of 11 U.S.C.A. § 541 makes it clear that funds in the debtor's possession held for a third-party do not become part of the estate in bankruptcy.") (citing H.R.Rep. No. 95–595, at 368 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6324)). The nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. *Butner v. United States*, 440 U.S. 48, 54–55 (1979).

48.    Here, the Debtor receives and holds payments from the Government for services provided to the Debtor by Loyal Source. The Second Award and the Judgment unequivocally

impose a constructive trust in favor of Loyal Source on future Government payments for services provided by Loyal Source under the Subcontract Agreement. *See* Second Award ¶ 6; Judgment ¶ 5. The Second Award and Judgment further make clear that the Debtor is enjoined from (i) "transferring, withdrawing, or using as collateral any and all prior payments made by the Government to [the Debtor] for services provided by Loyal Source" under the Subcontract Agreement, but not paid to the Debtor; and (ii) transferring any beneficial interest in the Prime Contract and Subcontract Agreement to any third-party. *See* Second Award ¶¶ 8-9; Judgment ¶¶ 7-8. As such, the Debtor is merely an intermediary channeling the funds from one party (the Government) to another (Loyal Source), and does not have any equitable or beneficial interest in the Government payments to render them property of the estate. *See In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) ("Congress intended that when a debtor is a mere conduit for funds to travel from one party to another, it lacks an equitable interest in the monies.") (citing *T & B Scottdale Contractors, Inc.*, 866 F.2d at 1376); *see also In re Lan Tamers, Inc.*, 281 B.R. at 784 (finding that debtor held federal reimbursement in resulting trust or constructive trust for the benefit of the City, and "[a]ccordingly, those funds, when received, shall not constitute property of the Debtor's bankruptcy estate").

49. Because the Government payments subject to the constructive trust are not property of the Debtor or its estate, such funds do not constitute cash collateral and cannot constitute DIP Collateral to which the DIP Lender's liens may attach.

50. Notably, section 363(a) of the Bankruptcy Code defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired *in which the estate* and an entity other than the estate have an interest." 11 U.S.C. § 363(a) (emphasis added). The Debtor defines "DIP Collateral" as "all of the real and

personal property (including all unencumbered property) *of the Debtor*", *see* Motion at p. 14, and "the Debtor's right, title and interest in, to and under all the *Debtor's assets*", *id.* (Interim Order) ¶ 5 (emphases added).

51.     Here, the estate lacks an interest in the Government payments subject to the constructive trust established in Loyal Source's favor, and such funds may not be used as cash collateral of the Debtor under section 363 or otherwise.  Nor can any funds held in trust for Loyal Source constitute DIP Collateral subject to the DIP Lender's liens.

52.     Loyal Source disputes Kore's contention that is has first priority prepetition lien in Government payments received by the Debtor on account of services provided by Loyal Source under the Subcontract Agreement.  Until such dispute is resolved, the Debtor should be prohibited from using any cash received by the Debtor from the Government relating to Loyal Source's services under the Subcontract Agreement pending an adjudication of Loyal Source's and Kore's respective rights in such funds.  The Debtor's continued use of any funds subject to the constructive trust in Loyal Source's favor must be prohibited as the preservation of the Debtor's future revenues remains uncertain and there is a likelihood that the Debtor will not replenish the cash collateral that it will use. Upon information and belief, funds received from the Government for services provided by Loyal Source have been segregated by the Debtor in a separate account.  At this early stage of the Bankruptcy Case, it is unclear how much other cash the Debtor maintains that is not subject to Loyal Source's constructive trust.

53.     Finally, to the extent the Court permits the Debtor to use Government payments subject to Loyal Source's constructive trust in this Bankruptcy Case, the Debtor should be required to account for all such cash, to provide Loyal Source with adequate protection for any diminution

in funds subject to its constructive trust, and to provide Loyal Source with a first priority security interest in replacement collateral.

**WHEREFORE**, Loyal Source respectfully requests the entry of an order: (i) denying the Debtor's Motion insofar as it seeks to use any Government payments subject to Loyal Source's constructive trust as Cash Collateral or DIP Collateral, (ii) prohibiting the Debtor's use or encumbrance of any Government payments subject to Loyal Source's constructive trust; (iii) providing Loyal Source with adequate protection for any use of cash that is subject to the constructive trust; and (iv) providing any further relief the Court deems just and proper given the circumstances.

DATED: February 27, 2024                    Respectfully Submitted,

*/s/ Patricia B. Jefferson*
Patricia B. Jefferson, Fed. Bar. No. 27668
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202
Phone: (410) 385-3406
Email: pjefferson@milesstockbridge.com

*Local Counsel for Loyal Source*

*/s/ Robert P. Charbonneau*
Robert P. Charbonneau, Fl. Bar No. 968234
Jesse R. Cloyd, Fl. Bar No. 58388
Agentis PLLC
45 Almeria Ave.
Coral Gables, Florida 33134
Phone:  305.722.2002
rpc@agentislaw.com
jrc@agentislaw.com

*Counsel for Loyal Source (Pro Hac Vice Pending)*

17

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on February 27, 2024 a true and correct copy of the foregoing was served by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case.

*/s/ Patricia B. Jefferson*
Patricia B. Jefferson
